Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 11, 2011          Decided May 20, 2011

No. 08-3014

UNITED STATES OF AMERICA,
APPELLEE

v.

JOHN BISONG, ALSO KNOWN AS JOHN BISONG ATEM,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00242-01)

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender.

*Stratton C. Strand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Roy W. McLeese III*, *Elizabeth Trosman*, and *Steven J. Durham*, Assistant U.S. Attorneys.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: John Bisong, aka John Bisong Atem, appeals his conviction by a jury of seven counts of bank fraud and four counts of immigration fraud, 18 U.S.C. §§ 1344 & 1546(a), whereby he filed hundreds of applications for labor certification containing false representations that various shell companies he controlled would employ his alien clients and he reproduced counterfeit checks to draw on his clients' banks accounts involving hundreds of thousands of dollars. He challenges the district court's decision to allow him to represent himself at trial, an alleged denial of his right to prepare his defense, and various rulings made by the district court in sentencing. Only the first requires extended discussion.

Bisong contends that the district court erred in determining that his waiver of his right to counsel under the Sixth Amendment to the U.S. Constitution was unequivocal and voluntary, knowing, and intelligent. Specifically, he contends that the district court, after initially denying his motion to represent himself and appointing an assistant Federal Public Defender ("AFPD") to represent him for four months, was required to inquire again whether his request to represent himself was unequivocal despite the passage of time and to repeat its prior admonishments on the dangers of self representation in order to ensure that his decision to represent himself, with standby counsel, was voluntary, knowing, and intelligent under *Faretta v. California*, 422 U.S. 806 (1975). Although the district court might have been well advised to inquire about Bisong's waiver of counsel on the same day it accepted the waiver, viewing the proceedings as a whole, we conclude that the district court's colloquy was constitutionally

adequate to confirm that he voluntarily chose to represent himself and did so knowingly and intelligently.

Further, assuming there is a Sixth Amendment right to prepare a *pro se* defense upon self-representation, Bisong fails to show he was denied adequate access to business records seized by law enforcement or that he was prejudiced in his defense by limitations on access to those materials and other government discovery. Documents were turned over by the prosecutor to both his retained counsel and the AFPD who remained as Bisong's standby counsel at trial, Bisong advised both counsel of the business records he sought, and the district court afforded him time to review them.

Finally, all but one of Bisong's challenges to the enhancements imposed by the district court in sentencing lack merit, and as to that enhancement there was insufficient evidence to show that Bisong was a leader under U.S. Sentencing Guidelines § 3B1.1. Accordingly, we affirm his conviction and remand for resentencing.

## I.

In a superseding indictment of September 25, 2002, Bisong was charged with operating, from March 1999 to January 2002, immigration fraud and check fraud schemes principally through the American Immigration Agency ("AIA"), which offered foreign nationals assistance in obtaining U.S. immigration documents, such as I-551 forms (i.e., "green cards"). The immigration fraud scheme involved filing 183 Applications for Alien Employment Certification (i.e., ETA-750 forms) that certified that the employer had sufficient funds to pay the alien and would be able to place the alien on payroll on or before the date of the alien's proposed entrance into the United States. *See* 8 U.S.C. §§ 1153(b)(3)(C), 1182(a)(5)(A). Bisong allegedly

promised clients that for a fee he would obtain green cards for them, within twelve months or their money would be refunded, by finding employment for them. Instead of finding legitimate employment, Bisong represented on the ETA-750 forms that his clients would be employed at one of twelve companies controlled by Bisong, knowing those companies lacked the resources to hire all of the aliens and would not in fact hire them. The bank fraud scheme involved Bisong stealing at least $260,850 from AIA clients by creating on his computer counterfeit checks made payable to AIA or one of his affiliated companies, using information provided on the legitimate checks, such as the routing number, and depositing the counterfeit checks drawn on several banks and federal credit unions into the AIA and affiliated accounts.

At his arraignment on June 17, 2002, Bisong was represented by Assistant Federal Public Defender ("AFPD") David Bos. Bisong pleaded not guilty to the charges in the May 31, 2002 indictment and he remained in custody unable to make bond. Retained counsel John Iweanoge entered his appearance on July 9, 2002 and shortly thereafter moved for expedited reconsideration of Bisong's bond. Iweanoge filed a renewed motion on September 19 when no action had been taken on his prior motion and requested an immediate hearing.

On October 30, 2002 Bisong wrote the first of three letters to the district court judge. In that letter Bisong expressed frustration over his representation and the pace of the proceedings. He claimed that continuances had been sought by both Bos and Iweanoge without his consent when he sought a speedy trial. He also stated that he had been unable to pay retained counsel and "cannot expect [Iweanoge] to spend money out of his own resources to do investigations on my case, gather evidence and arrange for witnesses to come to this court to testify." He claimed to be placed at a "grave disadvantage"

because of the volume of documents seized by the government, noting that it would take a lawyer "a minimum of 30 full days of hard work just to go through every paper [] seized, searching for what I need, and a minimum of 100 days just to go through every document stored in all the computers seized — assuming he is an expert in computers." He reported that Bos did not devote time to his case and "always told [Bisong] that he had so many other cases worse than [Bisong's] and he had to give them higher priority." Bisong further claimed that "to be able to defend [him] properly" an attorney would need to be familiar with "not only criminal law, but also business and corporate laws, immigration laws, labor laws, tax laws, international affairs and cultures and citizenship issues" as well as "how to reason and see things as leaders, businesspersons and people with vision do," and "must also have time to study and understand all these issues pertaining to my situation." Iweanoge, Bisong continued, "seem[ed] to be frustrated with [the] case," and Bisong stated that he was "losing [his] trust in [Iweanoge's] willingness to represent [his] best interest." "I do not know," Bisong wrote, "why he has not yet withdrawn from the case."

In a second letter of November 5, 2002, Bisong renewed his request for reconsideration of his bond and asked that a trial date be set for that month and that the District of Columbia detention facility where he was housed be ordered to give him "full-time access" to telephone, fax machine, email and library resources as well as access to all evidence the government seized. Bisong warned: "I may have to represent myself in the trial because I cannot pay my lawyer." In his view, "lawyers and public defenders" would not "be able to invest such amount of time" as necessary to defend his case. On November 12, 2002, Bisong wrote the district court judge that he needed his "help and immediate action." Meanwhile, on November 7, 2002, Iweanoge filed a motion to withdraw as counsel or alternatively

to certify payment of counsel fees by the district court, citing the lack of payment and counsel's unavailability for trial after December 20, 2002.

The district court held a hearing on the pending motions on November 25, 2002. During this hearing, the district court asked how Bisong wanted to proceed. First, regarding the status of counsel, Iweanoge stated that "Bisong would like me to continue to represent him if I'm going to be available to try to the case," but "wishes to be tried as soon as possible," noting that Bisong was presently "unable to pay [him] . . . to represent him" and "has been unable to play [sic]" because he is incarcerated and unable to make bond. Tr. 4–5 (Nov. 25, 2002). Iweanoge advised he would be available to try the case the following week but had prior commitments in other district courts starting December 18 and would be unavailable thereafter until June 2003. *Id.* at 5–6. Regarding Bisong's views, Iweanoge stated that "if he's going to continue to be incarcerated, then [Bisong] would rather go to trial with another lawyer even though I know that his correspondence with the [district] court . . . is that he would rather proceed by himself, but I've advised him and I believe he would be willing to have another lawyer represent him." *Id.* at 6–7. Upon consulting with Bisong, Iweanoge advised that "he doesn't want to be represented by the public defender, that he would rather represent himself if he's not going to be released pending the trial . . . when I'm going to be available." *Id.* at 7. The district court asked: "He wants to represent himself?" Iweanoge answered "Yes, Your Honor." The court: "He wants to be his own lawyer?" Iweanoge answered "Yes, Your Honor."

The district court then addressed Bisong directly: "That's a course of action that is ill-advised in the extreme," and noted that "a person who represents [himself] has a fool for a client." *Id.* at 7. Continuing, the district court stated "I'm going to

discourage you in the strongest possible terms from representing yourself." *Id*. at 8. The district court explained to Bisong:

> The most sophisticated lawyers that practice in this courthouse would have a hard time trying this case because of the subtleties and because of the complexities of the way the evidence, the documentary evidence, the evidence that has susceptibility to objections and so forth are shaped. . . . If you go to trial [without counsel] . . . I [will] hold you to the same rules as I hold any lawyer. I cannot favor you and not favor the other side . . . . So you would have to do what any person who represents a party before the court has to do and that is come up to speed on everything that you need to know in order to try a case. . . . So I want to impress [upon] you [ ] the perils of trying to do something which most good lawyers cannot do themselves because [the court is] not going to change the rules for you.

*Id.*

Second, after conferring with counsel for the parties to identify a way in which Bisong could inform his counsel of the documents he needed to see, the district court reaffirmed with Iweanoge that "Bisong is not interested in having another attorney anymore" and asked Bisong what he wanted to do inasmuch as Iweanoge would be unable to try the case. *Id*. at 34. Bisong asked what would be the earliest trial date if he represented himself, and the district court reviewed avenues it would explore to find a way to proceed promptly. The district court then repeated its advice to Bisong: "I cannot be more emphatic when I say how incredibly unwise it would be for you to try this case yourself," *id.* at 36, and explained that self-representation "is going to raise the likelihood of your

conviction." *Id.* Bisong responded that he had "spent so much time in jail already" that he "really want[ed] to get this over with." *Id.* The district court inquired of the prosecutor what the potential sentence could be. The prosecutor did not have the "final calculation," *id.*, but stated, based on the plea offer, that "it is a significant period of incarceration," *id*. The district court addressed Bisong:

> I've been doing this for 22 years and I'm telling you it is very unwise of you. Even if this were a simple civil case, I would be very animated in discouraging you, whichever side you're on, not to do this. On the other hand this is a serious criminal case and you're facing the potential of 70 to 87 months should you be convicted and I told you — I'm assuming that you are a very bright man. My comments have nothing to do with your capabilities, your intellectual aptitude or acumen. It has to do with the complexity of this case.

*Id.* at 37.

Third, when Bisong responded that he was "relying on the truth of the case," *id.*, the district court warned him that "to . . . present the truth of the case, it takes skill. . . . [The government has] a legion of evidence that [it] intends to present and that will be what you are contending with." *Id.* at 37–38. The district court emphasized that Bisong's "liberty interest [is] at risk," and that by "represent[ing] yourself . . . you have an array of rights which you will be putting on the line," for example, "decid[ing] whether you're going to testify or not" and noting that "once you get on the stand, you give up your Fifth Amendment privilege." *Id.* at 38. The district court continued:

> So therefore it would be [a] very unfortunate outcome for you, and I understand why you are in a hurry, to say

you want to get it over with . . . because of your desire to expedite things, to put yourself in grave risk when waiting and having the benefit of counsel who can screen and, as your attorney has done, . . . do[] a very impressive job of covering all the bases and attacking all the vulnerabilities in the government's case and demanding all the things that he, as your attorney, believes you're entitled to . . . . These are the kinds of protection that you would be giving up if you decided to represent yourself since you're not an attorney.

*Id.* at 39. Bisong responded, "Your Honor, I probably have to take the risk for the people who are suffering" because he was detained. *Id.* The district court asked Bisong whether he thought the "situation is going to improve if you are convicted . . . and . . . sentenced," warning that conviction was a "real possibility based on what the government's evidence shows so far if what you're going to use to meet that evidence is just your own skills, rather than those of any attorney." *Id.* at 39–40. Bisong responded, "if I have my things," then he could prove that the government's allegations were untrue. *Id.* at 41. The district court advised Iweanoge to talk with Bisong some more, to help Bisong "understand what he's asking the court to do," *id.*, and Iweanoge said he would. Confirming with the prosecutor that the trial would take approximately two weeks, the district court inquired again if Bisong "wish[ed] to try this case without the assistance of counsel." *Id.* at 42. Bisong responded, it was acceptable to give him "somebody to advise [him]" or to allow him to "select another attorney" at court expense. *Id.* Another option, Bisong suggested, was to release him so he could work to pay for an attorney. *Id.* at 43.

The matter of self-representation was not resolved at this time, however. After explaining to Bisong how the attorney-appointment process worked, the district court stated that it was

going to keep Iweanoge in the case "for the present," *id.* at 44, to explore the release-to-work option, ask the Federal Public Defender to confer with Iweanoge, and hold an ascertainment-of-counsel conference the following week. Toward the end of the November 25 hearing, AFPD Shawn Moore appeared in response to a telephone call and advised the district court that either he or Bos could take over representation, depending on the trial date. *Id.* at 47–48. At the ascertainment-of-counsel conference on December 11, 2002, Bisong, who had since conferred with Moore, stated he "really appreciate[d] [the district court's] [m]aking the effort to try to represent my best interest in this court but . . . I still feel that I have to represent myself . . . [and] I would like Mr. Moore to assist me in the process . . . ." Tr. 3 (Dec. 11, 2002). The district court responded, "Very well. That is fine," *id*. The district court inquired whether Moore would be agreeable to act as standby counsel for Bisong; Moore said he would.

The self-representation issue was effectively resolved at the January 21, 2003 status conference. The district court granted Iweanoge's motion to withdraw and appointed AFPD Moore as Bisong's attorney, assuring Bisong that Moore was "an extraordinary attorney." Tr. 5 (Jan. 21, 2003). Addressing Bisong's concern that Moore might not have the time or the background to handle his "complicated" case, *id.* at 9, the district court told Bisong that "[i]f Mr. Moore doesn't have the time or the expertise in some given area, I am sure he will let me know." *Id.* at 10. Shortly thereafter Moore entered his appearance and secured Bisong's release into third-party custody so Bisong could earn money to hire counsel, with the district court commenting this was only possible due to the "efforts of" Moore, who had "done everything that he [could] possibly do and done it appropriately in getting the matter to this stage." Tr. 21 (Feb. 21, 2003). Due to an outstanding

immigration detainer, however, Bisong was immediately taken into custody and transferred to a facility in southern Virginia.

On April 29, 2003, the parties filed a joint pretrial statement, styled as a statement by the United States and Bisong "through his amicus counsel" Moore. Parties' Joint Pretrial Statement 1, 02-CR-242 (RMU), ECF No. 62. The statement alerted the district court that "Bisong has stated his intention to represent himself during th[e] trial" with Moore serving as standby counsel. Appended to the joint statement was the government's motion *in limine* for an order governing *pro se* conduct at trial, noting that the district court had "counseled [Bisong] concerning the potential disadvantages and risks associated with self-representation" but suggesting the district court "should again question [Bisong] before the commencement of []his trial to insure that [his] waiver of counsel is knowing, intelligent, and voluntary." Government's Motion in Limine for Order Governing Conduct of Pro Se Litigant at Trial 2 & n.2, 02-CR-242 (RMU), ECF No. 62.

At the pretrial conference on May 12, 2003, the district court did not ask Bisong whether he still wished to represent himself. Instead, in reviewing how the trial would proceed, the district court asked Moore and Bisong what they proposed. Moore advised that he "believe[d] that Mr. Bisong still wishes to represent himself" and that Bisong would present the opening and closing statements and examine the witnesses. Tr. 4–5 (May 12, 2003). The district court asked Bisong whether he had any problem reading or writing English, which Bisong confirmed he did not. When the district court inquired whether Bisong had read the standing order that would govern the conduct of the trial, Moore stated he would get a copy of the order to Bisong that day. In the meantime, the district court reviewed the standing order with Bisong, stating: "First of all, let me emphasize that you do have the right to represent yourself

and you have Mr. Moore . . . to assist you in whatever way is appropriate and necessary," *id.* at 6, but "it is not an absolute right . . . if I come to conclude that in the course of representing yourself . . . you are deliberately engaging in any kind of obstructionist conduct, or if you are misbehaving, or . . . doing things that are contrary to . . . the standing order," *id.* at 6. The district court gave examples and continued reviewing the standing order with Bisong, during which Bisong repeatedly nodded or affirmatively indicated that he understood. The district court then formally granted Bisong's motion to represent himself, finding "at th[is] juncture . . it [is] Mr. Bisong's firm decision . . . to represent himself with the assistance of counsel, Mr. Shawn Moore." *Id.* at 15–16.

The issue of Bisong's access to seized documents remained unresolved. When the district court asked Bisong "is there anything else that you want to alert the court to or request," *id.* at 20, Bisong stated that "[u]p to this date [he had] not yet had access to most [of the] evidence." *Id.* Moore advised the district court that he would be returning to the U.S. attorney's office to retrieve documents at Bisong's request but that the boxes of evidence could not be made available to Bisong at the southern Virginia facility. The district court, satisfied with Moore's assurance that he would retrieve documents and that Bisong's transfer, at Moore's request, to a facility closer to the district court, would make him "more at hand," *id.* at 21, confirmed with Moore that Bisong had explained what it is he wished to see and Moore was prepared to look for what Bisong had requested. The district court concluded "[t]hen we will proceed with the commencement of trial on June 2nd." *Id.*

On May 16, 2003, Bisong (through Moore) filed a motion to continue the trial, explaining that he was also representing himself in a pending immigration matter and wanted to take that matter to an initial decision before turning to the criminal case.

The district court denied the motion. On May 27, 2003, Moore moved to have Bisong immediately transferred to D.C. Jail in view of his recent discovery that the Arlington County Jail would not permit contact visits with out-of-state attorneys, hindering his ability to share discovery with Bisong. The district court granted the motion. The following day Bisong was transferred to the Arlington County Jail but not to D.C. Jail until June, 2, 2003, the first day of trial. On the morning trial was to commence, Moore requested on Bisong's behalf that the presentation of evidence be continued for two days. The district court decided to proceed with jury selection and start the presentation of evidence the following day at 1:45 PM. Bisong stated that he had "not yet gone through any of the discovery," Tr. 8 (June 2, 2003), although Moore had received three boxes from the government, and that it was "very, very difficult" to tell what he would need without checking the seized computers where most of the files were stored. *Id.* at 8–9. In response, Moore assured the district court that he had reviewed all the available evidence and the prosecutor stated that he would assist review and retrieval of the evidence. The district court advised Bisong that he could have use of the courtroom to review evidence. When at the end of trial the following day Bisong expressed concern about his unfamiliarity with the evidence, the district court pointed out that he would have Friday, when the court was not in session, and the weekend for "additional preparation," Tr. 118 (June 3, 2003); *see* Tr. 170 (June 5, 2003). On June 4, 2003, Moore ensured that Bisong could bring a binder of evidence to the D.C. Jail. On June 5, 2003, the district court informed the Deputy U.S. Marshals that it was "absolutely imperative" that Bisong take boxes of documents to the D.C. Jail for review, Tr. 170 (June 5, 2003).

Eight AIA clients testified at trial, none of whom had received either green cards or their money back, and whose bank accounts and routing numbers Bisong had used to generate

counterfeit checks and withdraw money from their personal accounts. Bisong testified in his defense that he had no criminal knowledge or intent. *See* Tr. 53–148 (June 12, 2003); Tr. 2–70 (June 16, 2003). The jury found Bisong guilty as charged, of seven counts of bank fraud in violation of 18 U.S.C. § 1344; *id.* § 2, and four counts of immigration fraud in violation of 18 U.S.C. § 1546(a); *id.* § 2. The district court sentenced Bisong to 188 months' imprisonment, followed by five years' supervised release. Bisong appealed, and at the parties' request this court remanded for resentencing in view of *United States v. Booker*, 543 U.S. 220 (2005), without prejudice to his right to raise on appeal from the resentencing any issues related to the original judgment. *United States v. Bisong*, No. 04-3028 (Feb. 24, 2006). On remand the district court resentenced Bisong to 159 months' incarceration followed by five years' supervised release.

## II.

In *Faretta*, the Supreme Court held that in a criminal prosecution the defendant has a constitutional right to proceed without the counsel guaranteed by the Sixth Amendment when the defendant unequivocally elects to do so and where that election is voluntary, knowing, and intelligent. 422 U.S. at 835–36. As in prior cases, *see Carnley v. Cochran*, 369 U.S. 506, 513–16 (1961); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942); *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938), the Court placed responsibility on the trial court to ensure this right by conducting a colloquy: "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made

with his eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams*, 317 U.S. at 279).

This court first applied *Faretta* in *United States v. Bailey*, 675 F.2d 1292 (D.C. Cir. 1982), a case Bisong urges provides the rule of decision. We agree that *Bailey* provides significant guidance on the disposition of Bisong's appeal but conclude that it supports affirmance of his conviction. In that case the defendant requested the district court to vacate the appointment of counsel and, in response to questioning by the district court, stated that he was "intellectually capable" of representing himself, had studied some law while imprisoned, and generally thought that self-representation would "enhance" his "possibilities" of acquittal. *Id.* at 1298. Exercising its supervisory authority, this court "enjoined upon the [d]istrict [c]ourt the practice of making clear on the record the awareness by defendants of the dangers and disadvantages of self-representation as to which the Supreme Court in *Faretta* had voiced concern." *Id*. at 1300. The court reiterated this standard in *United States v. Klat*, 156 F.3d 1258 (D.C. Cir. 1998), explaining, however, that the court in *Bailey* "did not find that a failure to make such a finding clear on the record required reversal where the record as a whole indicated that the defendant's waiver of his right to counsel was knowing and voluntary." *Id.* at 1265.

As in *Bailey*, it is clear from the record that Bisong "consciously and emphatically wanted to represent himself." 675 F.2d at 1301. Bisong first advised the district court that he might represent himself by letter of November 5, 2002. When the subject of self-representation arose at the November 25, 2002 hearing, the district court urged Bisong to consider his decision further, following a strong admonishment against such a decision. At the December 11, 2002 ascertainment-of-counsel conference, Bisong remained firm about representing himself

while stating that he "appreciate[d]" the district court's "effort to try to represent [his] best interest." Tr. 3 (Dec. 11, 2002). At the January 21, 2003 status conference, even after the district court described Moore as "an extraordinary attorney," Tr. 5 (Jan. 21, 2003), and appointed Moore as Bisong's counsel because it had concluded Bisong was not "operating in his best behalf," *id.* at 6, Bisong confirmed that he still wanted to represent himself. Notwithstanding the fact that the district court did not ask Bisong to restate his self-representation request at the May 12, 2003 pretrial conference, Bisong participated in that hearing, responding affirmatively when asked if he understood what would be expected of him acting *pro se* at trial. Bisong was present when Moore represented that Bisong wished to represent himself. When the district court invited Bisong to raise any other issues, the only issue he raised concerned access to discovery, indicating, as do his letters to the district court, that he was comfortable expressing his concerns. It passes belief on such a record that Bisong's decision to represent himself was anything but conscious and emphatic. Indeed, the parallels between this record and that in *Bailey* supports a finding of an unequivocal waiver. In *Bailey* this court concluded that representation by counsel for several weeks prior to self-representation supported a finding of intentional waiver. 675 F.2d at 1301. Moore represented Bisong for four months prior to the pretrial conference and as standby counsel thereafter. Given Moore's pretrial representation of Bisong and his active participation during trial at Bisong's request, it is not plausible that Bisong viewed his decision to represent himself as involuntary.

To the extent Bisong maintains his decision to waive counsel was not voluntary because he faced a "Hobson's choice" between accepting ineffective appointed counsel and representing himself, the record belies his claim. In *United States v. Cunningham*, 145 F.3d 1385 (D.C. Cir. 1998), and in

*United States v. Hall*, 610 F.3d 727 (D.C. Cir. 2010), the court acknowledged that if a *Faretta* election appears grounded in dissatisfaction with counsel, the district court must evaluate the defendant's objections to ensure that a waiver of counsel is voluntary.  145 F.3d at 1392; *see also Hall*, 610 F.3d at 739. The only objection Bisong raised to Moore's representation was when he "wonder[ed]" aloud  whether Moore would have the time and legal background to represent him.  Tr. 9–10 (Jan. 21, 2003).  The district court addressed Bisong's concern in several ways: issuing orders for Bisong to be housed closer to the district court so he could have access to discovery; assuring Bisong that Moore was an "extraordinary attorney," Tr. 5 (Jan. 21, 2003), based on the district court's "fifteen or more years of experience" with Moore, Tr. 17 (Feb. 21, 2003), thanking Moore, in Bisong's presence, for "providing what I believe is a pristine and extraordinarily well styled and presented pretrial statement," Tr. 2 (May 12, 2003).   That Bisong neither contradicted these comments nor raised any objections to Moore's representation at the May 12, 2003 pretrial conference undermines a conclusion that Bisong viewed his choice as involuntary because he considered Moore was not competent. Bisong's  complaints about Bos and Iweanoge, which form a part of his argument on appeal, are not relevant; at the time the district court granted Bisong's *Faretta* motion on May 12, 2003, Bisong's choice was between Moore's representation and self-representation.

Also as in *Bailey*, this court may "surmise, as presumably did the [district] judge, that there was some method" in Bisong's insistence on representing himself. 675 F.2d at 1301. There, the defense against an escape charge was based on the dangerous and intolerable conditions at the jail in which the defendant was held.  This court concluded that the defendant was "surely entitled to think that he could himself most effectively and appealingly make those conditions known to the jury." *Id.*  So

too here.  Bisong was alleged to have used his own companies in a complex scheme to defraud his clients.  He held himself out as director, corporate officer, or registered agent of various business entities, and he had gone to some lengths to make them appear legitimate, including registering them with the D.C. Department of Consumer and Regulatory Affairs, obtaining employer identification numbers, and, for some, contracting for virtual office space.  However ill-advised his self-representation decision may have been, for the reasons identified by the district court, Bisong had reason to think he could most effectively explain to the jury the operations of his companies and why he thought his actions were lawful.

A further review of the record confirms that Bisong's decision to waive counsel was knowing and intelligent.  In *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987), the district court had informed the defendants "in general terms of the dangers of proceeding *pro se*," including the "seriousness of the charges," a warning that the district court could not assist in their defense, that defendants would have to conduct trial in accord with the Federal Rules of Evidence and Criminal Procedure, and that "it is a distinct handicap to be engaged in a serious criminal matter without any legal training or background and without the active assistance of a trained lawyer."  *Id.* at 599.  Although the defendants challenged the district court's failure to discuss the especially complex nature of cases under the Racketeer Influenced and Corrupt Organizations Act and the difficulties of preparing an unaided defense while incarcerated, this court concluded the colloquy was a "model."  *Id.*  Although the nature of a constitutionally adequate colloquy will depend upon the particular circumstances in an individual case, the contours of the *Brown* colloquy are present here.  The district court warned Bisong in strong terms on several occasions about the risks and difficulty of defending *pro se* against a criminal prosecution, especially given the complexities of the evidence

in his case. The district court also warned that it could not favor either side at trial and that Bisong would have to abide by the same rules as an attorney. The district court further emphasized the seriousness of the charges by advising Bisong of the pitfalls of his desire to get his trial "over with," Tr. 36, 39 (Nov. 25, 2002), because others were suffering when conviction would mean imprisonment, advising based on the government's plea offer that Bisong could be sentenced to more than 70 months' imprisonment.

Bisong nonetheless contends that the district court's colloquy was deficient to show his waiver of counsel was knowing and intelligent for two reasons: First, several months passed after the colloquy before his *pro se* request was granted during which time circumstances had changed significantly and warranted a new colloquy. Although Bisong had been represented by Moore for four months, trial was to commence a mere three weeks after his *pro se* request was granted. During this time he had been confined outside of the District of Columbia without personal access to his business records. Hence, he claims, any previously made waiver was no longer knowing and intelligent. But, as suggested by *Bailey*, the Sixth Amendment does not require a new colloquy to inform the defendant of the risks and difficulties of *pro se* representation where it is discernible in the record that the defendant was made well aware of those risks and difficulties. Bisong knew at least by the time of the pretrial conference that the trial would commence on June 2 and that because of his incarceration in Farmville he had not had personal access to all of his seized materials. He also was aware of the efforts by the district court to enable him to gain further personal access to the seized materials and discovery. Under the circumstances, "[n]either case law nor common sense supports the position that a trial court must advise a defendant of each and every difficulty he might encounter in a particular case." *Brown*, 823 F.2d at 599.

During the November 25, 2002 hearing the district court emphasized the seriousness of the charges, the difficulties of self-representation, the complexity of the evidence, and the fact that during trial the district court would not aid Bisong or relax any rules. At the May 12, 2003 pretrial conference, the district court addressed the access issue again, ensuring Bisong's access to discovery materials.

Second, Bisong points out, the original colloquy misstated his potential sentence, which ultimately was 159 months' imprisonment, not 70–87 months. In *Hall*, this court rejected a *Faretta* challenge where the district court gave an estimate of the sentence that turned out to be conservative, 610 F.3d at 741, explaining that the purpose of informing the defendant of the potential sentence is to impress upon him the fact that he is facing serious charges, *id.* The district court's advice to Bisong reflected the prosecutor's estimate based on a plea offer. Bisong does not suggest his counsel never advised him of the maximum sentence he could face if convicted of all charges and the record makes clear that the district court's colloquy made Bisong sufficiently cognizant of the seriousness of the charges against him to make a knowing and intelligent waiver of counsel. Bisong's reliance on *United States v. Silkwood*, 893 F.2d 245, 248–49 (10th Cir. 1989), is misplaced; there the defendant requested to act *pro se* in sentencing and the district court not only understated the potential effect of a sentencing enhancement but neither inquired into the defendant's allegations of attorney ineffectiveness nor warned the defendant of the pitfalls of self-representation. *Id.*

Upon review of the entire record, we conclude for these reasons that the district court's colloquy with Bisong was constitutionally adequate. It bears noting, however, that the *Farretta* issue might never have afforded a basis for appeal had the district court more closely hewed to the instruction in *Bailey*

that district courts to make clear on the record the findings that the defendant has "articulately and unmistakably" asserted his *Faretta* rights, that the waiver is voluntary, knowing, and intelligent, and that the defendant is "aware[ ] . . . of the dangers and disadvantages of self-representation." 675 F.2d at 1300. A more detailed record of *Faretta* findings, particularly when ruling on the self-representation request, would ensure the protection of a defendant's Sixth Amendment rights and also preserve a judgment where a defendant remains silent until appeal.

**III.**

Bisong also contends that the district court denied him an opportunity to review discovery and prepare his *pro se* defense, citing *United States v. Sarno*, 73 F.3d 1470 (9th Cir. 1995), where the Ninth Circuit stated "the Sixth Amendment demands that a *pro se* defendant who is incarcerated be afforded reasonable access to 'law books, witnesses, or other tools to prepare a defense,'" although noting that "[t]he right of access is not unlimited, but must be balanced against the legitimate security needs or resource restraints of the prison." *Id.* at 1491 (citation omitted). Bisong's objection on appeal is that the district court "kept counsel in the case until the eleventh hour such that [he] had only six hours to review selected documents before trial, and was never given access to the bulk of the discovery material." Appellant's Br. 44 (capitalization omitted). As he sees it, his requests to the district court for personal access to his business records and other discovery materials were for naught. *See id.* at 45–46.

The Supreme Court has made clear that "[t]here is no general constitutional right to discovery in a criminal case." *United States v. Ruiz*, 536 U.S. 622, 629 (2002). It also observed in *Faretta* that a *pro se* defendant "cannot thereafter

complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" 422 U.S. at 834 n. 46. Even assuming that *pro se* defendants have a Sixth Amendment right to discovery in preparing their defense, Bisong acknowledges that he must demonstrate prejudice in order to prevail on this claim. Bisong has not shown prejudice.

Bisong points to his general statement in opening argument that he had not had full access to seized records and to the sentencing enhancement for perjury, and he suggests that until he is afforded the "opportunity to look for exculpatory evidence," Reply Br. 18, he cannot provide specific examples of prejudice and that to the extent a new trial turns on a showing of prejudice a remand should be ordered. Id. at 19. His reliance on his perjury enhancement, which he does not challenge on appeal, is fanciful and reminds the court of a child who insists to her parents that the fault for her lie is with the facts for failing to comport with her statement. Even constitutional error would not forgive perjury. *See, e.g.*, *United States v. Mandujano*, 425 U.S. 564, 576–78 (1976) (plurality op.); *id.* at 584–85, 607–08 (Brennan, J., concurring); *id.* at 609 (Stewart, J., concurring); *United States v. Wong*, 431 U.S. 174, 178–79 (1977); *United States v. Bova*, 350 F.3d 224, 227–28 (1st Cir. 2003); *United States v. Olmeda*, 839 F.2d 1433, 1434–37 (11th Cir.1988). As to a remand to allow personal review of materials, Bisong is not appearing *pro se* on appeal and yet presents no excuse for failing to identify any records that would indicate he was prejudiced in preparing his defense, other than vague speculation that an open-ended review might produce exculpatory evidence. *See United States v. Agurs*, 427 U.S. 97 104, 112–13 (1976); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982). The record reveals that his retained counsel and AFPD had access to the seized records and discovery materials, and that although the arrangements for Bisong to have personal access prior to trial did not work out to the full extent ordered by the district court,

the district court ensured that standby counsel had access and was getting Bisong the records he requested prior to trial, and later afforded Bisong more time for review. Not a perfect scenario admittedly, but absent any showing of any prejudice, Bisong's contention fails.

## IV.

The district court sentenced Bisong using a base offense level of 6 and applied the following enhancements that he challenges on appeal: (1) loss of over $200,000; (2) 50 or more victims; (3) violation of an administrative order; (4) use of sophisticated mean; and (5) occupying a leadership role in the offense. Under the mandatory sentencing guidelines scheme, Bisong was subject to a sentencing range of 188–235 months' imprisonment; the district court imposed a sentence of 188 months. Upon resentencing in view of *Booker*, 543 U.S. 220, the district court concluded it had inappropriately grouped the bank fraud and immigration fraud and Bisong's sentencing range was therefore 135–168 months' imprisonment; the district court sentenced him to 159 months. This court "shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *see United States v. Tann*, 532 F.3d 868, 873 (D.C. Cir. 2008). Due deference "presumably . . . fall[s] somewhere between *de novo* and 'clearly erroneous.'" *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994). Our review of the district court's findings of fact is for clear error. *United States v. Brockenborrugh*, 575 F.3d 726, 738 (D.C. Cir. 2009).

U.S.S.G. § 3B1.1. Bisong challenges the four-level enhancement to his sentence on the ground that the district court clearly erred in finding that he was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1. The Guideline applies

only where a "participant" is "criminally responsible for the commission of the offense." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. 1. The "participant" must "commit[ ] all of the elements of a statutory crime with the *requisite mens rea*." *United States v. Brodie*, 524 F.3d 259, 271 (D.C. Cir. 2008) (emphasis original) (quotation marks and citation omitted). Although the participant need not be criminally responsible for the same crime of which the supervising defendant was convicted, the enhancement applies only where a participant, at a minimum, is criminally responsible as an accessory. *See id.* "[S]upervision of an unwitting individual cannot justify an enhancement," *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001), but where the participant has knowledge but commits no *actus reus* justifying criminal responsibility the supervision of such person similarly may not justify an enhancement.

The district court did not clearly err in applying this enhancement to Bisong's immigration fraud conviction. A government investigator testified that AIA employees completed applications knowing that the sponsoring companies were fictitious and signed the names of AIA clients knowing that the signatures were not authorized.

With regard to the bank fraud scheme, however, the evidence shows only that his office manager received telephone calls from Bisong's clients complaining about withdrawals from their bank accounts, that a second employee resigned upon learning that what "Bisong was doing was wrong and criminal," Tr. 35–36 (Mar. 22, 2004), and that a paralegal concluded that Bisong was violating the law. There was no evidence the paralegal knew of Bisong's criminal responsibility for bank fraud. At most the evidence shows that the paralegal may have given "wishy washy answers," Tr. 107–10 (June 3, 2003), to a client complaining about an unauthorized withdrawal from her

bank account. None of the evidence indicated that any employee actually assisted Bisong in the bank fraud as such. Although some employees were not unwitting because they may have had some awareness of Bisong's check fraud activity, there is no evidence that they assisted it.

*United States v. Bapack*, 129 F.3d 1320 (D.C. Cir. 1997), is not to the contrary. Bapack was convicted of Medicare and Medicaid fraud and there was evidence that nurses in her employ falsified records, although only for purposes of District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") certification. The court concluded that a jury could reasonably find, based on the nurses' knowledge, that they were "well aware that the falsified records would ultimately be submitted to the Medicaid program." *Id*. at 1326. The court noted that the DCRA acts as an agent for the U.S. Department of Health and Human Services regarding Medicare certifications and that the forged DCRA form may have constituted Medicare fraud. *Id.* at 1326 & n.12. By contrast, here there is no similar relationship between the activities of employee-participants in the immigration fraud scheme and Bisong's bank fraud scheme; no reason, for instance, for them to believe that the immigration fraud would result in check fraud and no relationship between the government authorities to which Bisong and his employees submitted falsified immigration forms and the banks from which Bisong cashed counterfeit checks.

The district court's finding with respect to bank fraud that Bisong was an "organizer or leader" under U.S.S.G. § 3B1.1 was therefore clearly erroneous and a remand for resentencing is required. *See United States v. Mathis*, 216 F.3d 18, 27 (D. C. Cir. 2000). Bisong's other challenges to the enhancements of his sentence, however, are without merit.

26

U.S.S.G. § 2B1.1(b)(1): The district court found that the bank fraud loss exceeded $200,000, which resulted in a twelve-level enhancement under § 2B1.1(b)(1). For sentencing, the loss amount need only be a reasonable estimate of the loss based on the available information. *United States v. Bras*, 483 F.3d 103, 112 (D.C. Cir. 2007). The evidence at trial showed that for the eight victims who testified at trial: The checks bore unique information on the signature line; none of the victims authorized Bisong to create and deposit checks on their behalf; Bisong deposited 65 batches of similarly unique computer-generated checks in amounts totaling $267,881; the checks had been generated and saved on Bisong's laptop computer; and a government investigator uncovered many more victims who had not authorized the withdrawals from their bank accounts. Computer-generated checks were introduced into evidence at trial for the accounts of 476 AIA clients. Bisong's contention that there was insufficient evidence to show the loss exceeded $200,000 is meritless.

U.S.S.G. § 2B1.1(b)(2)(B) . The district court's imposition of a four-level enhancement based on Bisong's defrauding 50 or more victims is likewise not based on a clearly erroneous factual finding. Section 2B1.1 defines a "victim" as "any person who sustained any part of the actual loss," U.S.S.G. § 2B1.1 cmt. n. 1, including "individuals, corporations, [and] companies," *id.* Bisong suggests there was no actual loss because any defrauded AIA clients were reimbursed by their respective banks and those banks were reimbursed by Bisong's bank. An apt analogy is identity theft where the victim is fully reimbursed by a third party. Application Note 4(E) to a more recent edition of the Guidines Manual states that a "victim" includes, in addition to the definition in the Guidelines, "any individual whose means of identification was used unlawfully or without authority." U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.4(E) (Nov. 1, 2010). The Commission explained that "such an individual,

even if fully reimbursed, must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in the loss calculations under the guidelines." U.S.S.G. § 2B1.1, historical note (2009). Given that funds were drawn on the accounts of 476 clients at more than 50 banks the district court did not clearly err in inferring that over 50 people would have to devote substantial time obtaining reimbursement, notwithstanding the fact that eventually they would be made financially whole for the initial loss. *Cf. United States v. Gottfried*, 58 F.3d 648, 652 (D.C. Cir. 1995).

U.S.S.G. § 2B1.1(b)(8)(C)   The district court imposed a two-level enhancement based on Bisong's "violation of any prior, specific judicial or administrative order, injunction, decree, or process." U.S.S.G. § 2B1.1(b)(8)(C) (codified at § 2B1.1(b)(7) when Bisong was sentenced). In 1994 an Administrative Law Judge, finding that Bisong was making misrepresentations in advertising about his alien assistance activities, ordered him to cease and desist from  "engaging in any unlawful trade practices in the District of Columbia."  On appeal Bisong maintains that he was never informed of the order and that the general prohibition against unlawful trade practices was not "specific" within the meaning of the Guidelines. For sentencing, the preponderance of evidence standard applies. *United States v. Long*, 328 F.3d 655, 670 (D.C. Cir. 2003).

The government, acknowledging a lack of evidence that Bisong attended any but the first day of his 1994 administrative hearing and that the order was mailed to him, maintains Bisong's "willful blindness" is to no avail because the evidence showed that Bisong telephoned the judge to request a rescheduled date and then failed to appear on that date. In *United States v. Alston-Graves*, 435 F.3d 331, 341 (D.C. Cir. 2006), the court identified two predominant formulations of

"willful blindness": when a defendant "purposely contrived to avoid learning all the facts," or the defendant "was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact." *Id.* (internal citations omitted). Given the evidence that Bisong was aware of the proceedings, attended the first day, sought and obtained a rescheduled date for continuance of the hearing and then failed to show up, the district court could reasonably infer, for it had observed that Bisong was an intelligent man, that, based on a preponderance of the evidence, Bisong realized the high probability that an order would issue; he does not suggest he was unaware of the nature of the complaint before the judge or of the evidence on which it was based, only that he was unaware of the order. The order simply told Bisong to "cease and desist from engaging in *any* unlawful trade practices in the District of Columbia" (emphasis added), something he was bound to know in any event. Bisong's suggestion now that the order was not "specific" also fails because the addition of the word did not appear to affect the substance of the Guideline: an order is a particular order. *See United States v. Howard*, 350 F.3d 125, 126 (D.C. Cir. 2003).

U.S.S.G. § 2B1.1(9)(C)   In finding that Bisong's fraud involved "sophisticated means," and warranted a two-level sentencing enhancement, the district court relied principally on the existence of shell corporations, bank accounts, virtual offices and false registration with D.C. government agencies. Bisong renews the argument in his presentencing memorandum upon remand that his bank fraud claims did not involve sophisticated means and maintains on appeal that it was simply a "very basic" type of theft. Appellant's Br. 63. The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" including "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.

SENTENCING GUIDELINES MANUAL § 2B1.1 cmt.8. Although check fraud, Bisong maintains, "could be executed by virtually anyone in possession of a check from a third party," Appellant's Br. 63, the evidence showed that the same fraudulent corporation used to entice victims into his immigration fraud scheme became the depository for the bank fraud scheme and that Bisong used computer software to create counterfeit checks that appeared on their face to provide him with permission to deposit funds without signature. The possession of "false document-making implements" can constitute "sophisticated means." *United States v. McCants*, 554 F.3d 155, 163 (D.C. Cir. 2009).

Accordingly, we affirm Bisong's conviction of immigration fraud and bank fraud, and we remand the case for resentencing in view of clear error in applying U.S.S.G. § 3B1.1 to the bank fraud conviction.