# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 12, 2006       Decided December 22, 2006

No. 05-3086

UNITED STATES OF AMERICA,
APPELLEE

V.

BARRY WILLIAM GEWIN,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00366-01)

---

*Bruce C. Bishop* argued the cause for appellant. With him on the briefs was *Mark J. Hulkower*.

*Demetra Lambros*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee. *Ellen R. Meltzer*, Attorney, entered an appearance.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: A federal grand jury indicted Barry Gewin and several co-defendants on one count of conspiracy to commit securities and wire fraud, one substantive count of securities fraud, and six counts of wire fraud, all in connection with the alleged manipulation and fraudulent trading of stock in a company called "2DoTrade." Gewin and two colleagues were tried jointly before a jury; three others pled guilty, two of them testifying against Gewin at trial. Two co-defendants, living overseas, were not apprehended.

The government describes the case as involving a "pump and dump" scheme. It argued at trial that Gewin and his co-conspirators orchestrated a "reverse merger" of a public shell company and 2DoTrade, a private Nevada corporation which had no employees or operations and $26 in assets. The group allegedly secured hidden control of most of the merged entity's publicly tradable stock, pumped up the share price through a campaign of strategically-timed, fraudulent press releases, and sold its holdings into the artificially inflated market.

The jury convicted Gewin of conspiracy to commit securities fraud, the substantive securities fraud count, and two of the six wire fraud counts. The trial court sentenced him to 108 months' imprisonment and three years' supervised release, ordered him to pay $1,975,786 in restitution jointly and severally with his co-conspirators, and imposed a $500,000 fine.

On appeal, Gewin argues that the district court erred in allowing him to represent himself at trial without finding that he knowingly and intelligently waived his right to counsel, in admitting into evidence statements of Gewin's co-conspirators over hearsay objections, and in imposing the $500,000 fine. We affirm.

3

\* \* \*

Some two months before trial, Gewin discharged his retained counsel and declared his intention to conduct plea negotiations on his own behalf. The court urged Gewin to hire a lawyer, arranged for him to meet with the Federal Public Defender, and held a hearing on whether Gewin intended to waive his right to counsel. In the end Gewin represented himself at trial, for the most part rejecting even the assistance of stand-by counsel appointed by the court. His theory that the trial court inadequately vetted his waiver rests mainly on his contention that the waiver colloquies related solely to plea negotiations, not trial itself.

A criminal defendant has a constitutional right to represent himself at trial if he knowingly, intelligently, and voluntarily waives his Sixth Amendment right to counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975). So that the "record will establish that [the defendant] knows what he is doing and his choice is made with eyes open," he must be made aware of the "dangers and disadvantages of self-representation." *Id.* (internal quotation marks omitted). That a waiver must be "intelligent" doesn't mean it must be wise or even reasonable; it is "undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id.* at 834; see also *United States v. Cunningham*, 145 F.3d 1385, 1391 (D.C. Cir. 1998). A defendant's technical legal knowledge is, therefore, "not relevant to an assessment of his knowing exercise of the right to defend himself." *Faretta*, 422 U.S. at 836.

To satisfy *Faretta*, a trial court must engage the defendant in a "short discussion on the record" about the dangers and disadvantages of self-representation. *United States v. Brown*, 823 F.2d 591, 599 (D.C. Cir. 1987). We have characterized as

"model" one such colloquy in which the court cautioned the defendants about the seriousness of the charges against them and warned that the judge could not assist in their defense, that the trial would be conducted under the Federal Rules of Evidence and Criminal Procedure, and that proceeding without the assistance of a trained lawyer would constitute a "distinct handicap." *Id.* The court asked the defendants "many times" whether they understood the court's remarks or had any questions. *Id.*

We review de novo whether the record demonstrates a knowing and intelligent waiver of the right to counsel. *Cunningham*, 145 F.3d at 1392. A district court's determination about whether a defendant understood warnings against self-representation, however, is a "pure question of fact" that we disturb only if clearly erroneous. *Id.*

At its *Faretta* hearing, the trial court here engaged in a wide-ranging colloquy with Gewin, covering topics germane to both plea negotiations and trial: the elements of offenses charged; Gewin's potential sentencing exposure; jury selection; possible trial defenses and motions; the right to confront and cross-examine witnesses, remain silent, testify, subpoena witnesses, and appeal; and the consequences of taking or not taking the stand. Joint Appendix ("J.A.") 82-87/16-29. The court warned Gewin that it could not advise him how to try his case or conduct plea negotiations; that the trial would be conducted according to the Federal Rules of Evidence and Federal Rules of Criminal Procedure; that Gewin could face special risks proceeding pro se at a trial in which his co-defendants had legal representation; and that Gewin would face complications raising objections, cross-examining witnesses, and conducting direct examination without a lawyer. J.A. 86/26-27, 88-89/35-37. Gewin repeatedly indicated he didn't want a lawyer and that he understood the risks involved. J.A. 82-89/16-37.

In context, the statements Gewin cites to show that the hearing was limited to plea negotiations merely reflected the court's attention to logistical questions that might arise if Gewin's case proceeded to trial. The court's statements that "we will have a further discussion" if plea negotiations failed and could "make an independent decision" at that time, for instance, were made in the course of an extensive discussion about the merits of securing stand-by counsel early, so that, if the plea negotiations were to fail, counsel could be available at trial (both to advise Gewin and be ready to become active counsel if Gewin gave up self-representation). J.A. 84/18, 89-90/40-43; see also Order, Apr. 29, 2004, J.A. 121-22 (citing *United States v. Dougherty*, 473 F.2d 1113, 1124-25 (D.C. Cir. 1972) (suggesting "utility" of making amicus counsel available to pro se defendants)).

The broad range of trial-related concerns discussed at the *Faretta* hearing—and the court's repeated efforts to confirm there that Gewin understood the discussion and intended to proceed without a lawyer—amply support the conclusion that Gewin knowingly and intelligently waived the right to counsel. Gewin's contention that he subjectively understood the waiver to be limited to plea negotiations is also undercut by his colloquies with the court on the eve of trial, explicitly addressing the implications for trial of the choice between self-representation (with or without stand-by counsel) and representation by counsel. See, e.g., J.A. 206/53-55 (May 5 status conference).

Gewin also asserts that his trial-day request for additional time to seek counsel demonstrates that he didn't intend to waive his Sixth Amendment right. Appellant's Br. at 14-15, 29-30. But in the lead-up to trial Gewin explicitly and repeatedly stated that he wanted to proceed without a lawyer. Just five days before trial, for instance, Gewin stated flatly, "I am going to not have counsel." J.A. 210/71; see also J.A.

199-200/6-11, 206/55. The district court quite justifiably characterized Gewin's trial-day request as "dilatory." J.A. 303/19.

Viewing the record as a whole, we find the trial court's conclusion fully entitled to deference, and hold that Gewin's statement does not preclude a finding that he knowingly and intelligently waived the right to counsel. (We note that Gewin concedes that the district court acted within its discretion in denying his request for a continuance, Appellant's Br. at 15, 30, and does not claim that his trial-day request constituted a revocation of an earlier waiver.)

Gewin finally points to his pro se, pre-trial submissions to the court as proof of the pudding—evidencing such a misunderstanding of the legal system as to foreclose a finding of intelligent waiver. But the Supreme Court has explicitly rejected the argument that competence to waive the right to counsel is predicated on competence to represent oneself at trial. A defendant's ability to represent himself "has no bearing upon his competence to *choose* self-representation"; technical legal knowledge is simply "not relevant" to the *Faretta* inquiry. *Godinez v. Moran*, 509 U.S. 389, 399-400 (1993); *Faretta*, 422 U.S. at 836. And, as we have said, the record more than supports the conclusion that Gewin in fact understood the "dangers and disadvantages of self-representation" when he waived his right to counsel.

\* \* \*

The district court admitted, over hearsay objections and "subject to connection," testimony by Gewin's co-defendants about the conduct and statements of the scheme's participants. At the close of the government's case, the district court ruled that a preponderance of the evidence supported a finding that

the group had engaged in a common enterprise of stock promotion, Mem. Op. (June 2, 2004) at 14, J.A. at 771, 784, which in fact defendant didn't dispute, *id.* at 11, J.A. 781. The court rejected Gewin's claim, renewed here, that Rule 801(d)(2)(E) of the Federal Rules of Evidence requires, before admission of co-conspirators' out-of-court statements, a showing of an *unlawful* conspiracy, not merely action in concert toward a common goal. *Id*. at 1-10, J.A. at 771-80.

A district court's interpretation of the Federal Rules of Evidence is a question of law, which we review de novo. See, e.g., *United States v. Weisz*, 718 F.2d 413, 432-35 (D.C. Cir. 1983); accord *Hathaway v. Coughlin*, 99 F.3d 550, 555 (2d Cir. 1996).

Rule 801(d)(2)(E) authorizes the admission of an out-of-court statement "by a coconspirator of a party during the course and in furtherance of the conspiracy." Where a defendant objects to such an admission, however, the district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant were members of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). Although *Bourjaily* allowed courts to consider the content of the out-of-court statements in making this determination, *id.* at 181, and left open whether such statements *alone* could support the necessary finding, *id*., our circuit has held that the finding must rest on some independent evidence of the conspiracy. *United States v. Gatling*, 96 F.3d 1511, 1520-21 (D.C. Cir. 1996). A court can preliminarily admit hearsay statements of co-conspirators, subject to connection through proof of conspiracy. *See United States v. Jackson*, 627 F.2d 1198, 1218 (D.C. Cir. 1980) (approving procedure).

Although Rule 801(d)(2)(E) refers to "conspiracy" and "coconspirators"—potentially giving Gewin's argument some

force on first impression—our precedents hold that the doctrine is not limited to unlawful combinations. *Weisz*, 718 F.2d at 433. Rather, the rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, "embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are . . . admissible against the others, if made in furtherance of the common goal." *Id.* In support we quoted the 1974 Senate Advisory Committee note to Rule 801(d)(2)(E), which said that the rule was "meant to carry forward the universally accepted doctrine that a *joint venturer* is considered as a coconspirator for the purpose of this [R]ule even though no conspiracy has been charged." *Id.* (alteration and emphasis added in *Weisz*); see also *United States v. Owens*, 484 U.S. 554, 562 (1988) (invoking Advisory Committee note in interpreting Federal Rules of Evidence).

*United States v. Beckham*, 968 F.2d 47 (D.C. Cir. 1992), is not to the contrary. There, we affirmed a conviction on the ground that hearsay evidence had been properly admitted under the adoptive admissions exception, Fed. R. Evid. 801(d)(2)(B). 968 F.2d at 51. We discussed (and rejected) the co-conspirator exception, and noted in passing that the evidence did not show a "common unlawful objective." *Id*. More pertinently we said that there was, in fact, "scant basis for inferring . . . a criminal enterprise or . . . *any sort of prior agreement*." *Id.* (emphasis added). Thus *Beckham*'s holding was simply that the co-conspirator exception does not apply where the evidence fails to show any common undertaking at all, and its language asserted no requirement that the prior agreement be unlawful.

Gewin asserts, in turn, that because the joint venture in *Weisz*—bribing a United States Congressman—was inherently illegal, *Weisz* could not have held that statements of legal joint

venturers are admissible under Rule 801(d)(2)(E), and its discussions of the record were only to show that illegality had been shown by *independent evidence*. But *Weisz*'s discussion of the record evidence was made in the alternative to its central holding that such a showing was not required. 718 F.2d at 434.

Gewin also asserts that *Weisz* should be read not for the rule that statements of legal joint venturers are admissible under Rule 801(d)(2)(E), but rather for a narrower proposition relating to the evidence a court can consider in ruling on admissibility. In the pre-*Bourjaily* world of the *Weisz* decision, out-of-court declarations were admissible only if a court found conspiracy entirely on the basis of independent evidence; hearsay could not, it was said, "bootstrap" itself into evidence. *Glasser v. United States*, 315 U.S. 60, 74-75 (1942). In *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229 (1917)—a pre-*Bourjaily* suit by an employer for an injunction against the attempted unionization of his coal mine—the Supreme Court held that, at common law, although independent evidence was required to show the existence of a combination before out-of-court statements of co-conspirators were admissible, "[t]he element of illegality may be shown by the [out-of-court] declarations themselves." *Id.* at 249. Gewin argues that *Weisz* (decided after the enactment of the Federal Rules of Evidence) should be read for the analogous proposition that in deciding admissibility under Rule 801(d)(2)(E), a court must find independent evidence of a joint venture, but can consider the out-of-court statements in showing that venture's illegality. Appellant's Br. at 35-36.

But this argument cannot survive *Weisz*'s clear statements, cited above, that Rule 801(d)(2)(E) is based on principles of agency and partnership law, that the use of the term "conspiracy" does not limit the doctrine to unlawful

combinations, and that the doctrine applies equally in civil and criminal cases.

In short, we follow our decision in *Weisz* and hold that the district court properly admitted out-of-court statements upon finding a lawful joint enterprise. Given our holding, Gewin plainly cannot succeed in arguing that the district court's 801(d)(2)(E) ruling constituted a tacit concession that the government had not shown an unlawful purpose by a preponderance. The district court simply and properly applied the law.

* * *

Finally, Gewin claims that the district court erred in finding that he was or would become able to pay a $500,000 fine.

The now non-mandatory Sentencing Guidelines advise a district court to impose a fine "except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S. SENTENCING GUIDELINES MANUAL § 5E1.2(a) (2004). While the Guidelines indicate that a court should consider the defendant's ability to pay in determining the amount of the fine, *id.* § 5E1.2(d), the sentencing judge is not required to make explicit findings of fact. *United States v. Mastropierro*, 931 F.2d 905, 906 (D.C. Cir. 1991). We typically review a district court's implicit findings for clear error, *id.* at 907, but the government asserts that the plain error standard applies here because Gewin did not preserve the matter for appeal. Because the record provides several reasons to believe that Gewin was at least "likely to become" able to pay, we find no error—much less clear or plain error. Thus we affirm the fine without resolving the parties' dispute over the standard of review.

Gewin rests on *United States v. Anderson*, 39 F.3d 331 (D.C. Cir. 1994), *rev'd in part on other grounds*, 59 F.3d 1323 (D.C. Cir. 1995) (en banc), in which we overturned as clearly erroneous the imposition of a $1,000,000 fine. There, recognizing that defendant's net worth was only about $96,000, the district court noted vaguely that the defendant might have additional money in Panama. *Id.* at 358. But the record appears to have suggested that such resources were at best a dim possibility. We observed that "[n]othing in the . . . record . . . even remotely suggests that [the defendant] could ever pay a $1,000,000 fine." *Id.* The defendant had a net worth of less than ten percent of the fine imposed, would be "rather old" to work off the fine after serving his 53-year, 9-month sentence, and, as an illegal alien, would be subject to deportation on his release. *Id.*

Further, as the "not likely to become able to pay" formula in § 5E1.2(a) indicates, the existence of some uncertainty about future ability to pay doesn't preclude imposition of a fine. In *Mastropierro*, 931 F.2d at 907-08, for instance, we affirmed a $5,000 fine despite evidence that defendants had no "substantial assets"; they could in the future become employed and pay their fines over time. Moreover, in *United States v. Rezaq*, 134 F.3d 1121, 1127, 1140-41 & n.14 (D.C. Cir. 1998), we affirmed a finding that the defendant had the ability to pay $254,000 in restitution despite his "limited" assets and life sentence, based on an admittedly "speculative" prospect of future earnings from writing books or articles about his crimes.

Gewin points to statements from his sentencing hearing he believes evidence a record as inadequate as that in *Anderson*. But Gewin's situation is quite different. Before imposing the $500,000 fine, the district court noted that Gewin claimed $651,541 in various accounts and stock worth some $1.5 million. The court did acknowledge a dispute

between Gewin and a co-defendant over the stock, and, in part because of this uncertainty, ultimately rejected the government's request for a larger fine. But the court also reasoned Gewin might not have to pay the entire $1,975,786 in restitution, given that some injured investors wouldn't ever seek compensation, and that Gewin's co-defendants were jointly and severally liable for whatever amount was claimed.

Moreover, the record suggests that Gewin was less than forthright with the court about the state of his finances. The district court commented that Gewin had "stonewalled" the court from obtaining updated and accurate financial information. J.A. 1080-87. As we said in *Anderson*, "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine." 39 F.3d at 358. But Gewin claimed a net worth of more than $2 million, will be in his mid-40s when released, and is a college graduate and a licensed pilot. Thus, the record as a whole amply supports the view that Gewin was able or likely to become able to pay the fine imposed.

\* \* \*

Because we find no merit in Gewin's claims, his conviction and sentence are hereby

*Affirmed*.