# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 17, 2016     Decided December 27, 2016

No. 13-3085

UNITED STATES OF AMERICA,
APPELLEE

v.

LAFRANCES DUDLEY O'NEAL,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cr-00355-1)

———

*Benjamin Beaton*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the briefs was *Paul J. Zidlicky*.

*LaFrances Dudley O'Neal*, pro se, filed the briefs for appellant.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Elizabeth Trosman*, *John P. Mannarino*, and *Virginia Cheatham*, Assistant U.S. Attorneys. *Elizabeth H. Danello*, Assistant U.S. Attorney, entered an appearance.

Before: BROWN, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Appellant LaFrances Dudley O'Neal challenges her conviction for conspiracy and bank fraud stemming from a scheme to obtain mortgage loans using straw purchasers, false loan applications, and forged appraisals.[1]  Following O'Neal's conviction, the District Court imposed a sentence of forty-eight months' imprisonment plus supervised release and restitution.  The challenge to O'Neal's conviction turns on two evidentiary decisions made by the District Court.  O'Neal represented herself at sentencing, and we must further determine whether her waiver of the right to counsel at the sentencing stage was knowing and intelligent.

After consideration of these questions, we affirm both O'Neal's conviction and sentence.

# I.

## A.

O'Neal is a former paramedic trainer for the D.C. Fire Department, who ran her own business providing medical training.  She also started another company, GL Real Estate Development, to develop group homes and community-assisted living for the elderly.

---

[1] In her *pro se* filings, O'Neal raises only frivolous arguments, which we summarily reject.  Amicus for O'Neal identified the evidentiary and constitutional issues discussed herein.

In 2006 and 2007, O'Neal was involved in the purchase of seven properties, financed by mortgage loans that totaled over $2.6 million. O'Neal originally planned to convert all seven properties into group homes, but – after purchasing them – learned of regulatory requirements that made it infeasible to turn the smaller properties into group homes. Ultimately, O'Neal converted three properties into group homes and the other four properties into Section 8 housing. Although O'Neal obtained the required regulatory approvals, no one ever moved into the group homes.

Each property was purchased in the name of a straw buyer. Each straw buyer received approximately $5,000 from O'Neal for each property purchased in his or her name. As the straw buyers would not have had sufficient income to qualify for the loans, their income and employment information was falsified on the loan applications. In addition, forged appraisals of the properties were used to support higher loan amounts, bank funds received by the title company in advance of closing were illicitly used as the borrower's down payment, and invoices were provided to lenders suggesting that renovations not yet undertaken had in fact already been performed.

Eventually, all seven properties fell into default and the lenders that held the mortgages sustained an aggregate loss of $964,503.

**B.**

On December 7, 2011, the grand jury returned a seven-count indictment against O'Neal and Donald Ramsey, a mortgage broker who prepared some of the loan documents.

Before trial – and after O'Neal had made several bizarre statements at the initial status conference – the District Court

ordered O'Neal to undergo a forensic screening to evaluate her mental capacity. This initial screening determined that O'Neal was competent to stand trial. However, O'Neal later expressed a desire to represent herself and the District Court engaged in a lengthy colloquy about the dangers of self-representation, given the complexities of the rules of evidence, cross-examination, opening statements, jury selection, investigation, and other aspects of trial practice. The District Court then ordered an in-patient competency examination. *See generally Indiana v. Edwards*, 554 U.S. 164 (2008). At a subsequent status hearing – when O'Neal continued to state she wished to represent herself – the District Court inquired further about whether O'Neal understood the charges against her, informed her of the maximum prison sentence, fine, and other consequences for each charge, and questioned O'Neal regarding her educational background, legal experience, and knowledge of trial procedure and the Federal Rules of Evidence. The District Court found she was competent to represent herself at trial and made a knowing and intelligent waiver of her right to counsel. Shortly before trial, however, O'Neal changed her mind and elected to be represented by retained counsel.

Meanwhile, O'Neal's co-defendant, Donald Ramsey, entered into a plea agreement in which he agreed to cooperate with the Government in O'Neal's prosecution. Ramsey was a key witness for the prosecution, linking O'Neal to the fraudulent documents and false statements that were submitted to the lenders.

At trial, the District Court prevented defense counsel from questioning Ramsey during recross-examination about two prior incidents that potentially reflected on Ramsey's character for truthfulness. The District Court also barred

testimony by another witness about an alleged invitation from Ramsey to participate in "shady" mortgages.

On March 27, 2013, the jury returned a verdict finding O'Neal guilty of conspiracy and three counts of bank fraud, but not guilty of mail fraud and first-degree fraud.

At the sentencing hearing on September 4, 2013, trial counsel announced that O'Neal would represent herself at sentencing. Trial counsel had prepared and filed a sentencing memorandum with the District Court, but did not participate in the hearing other than to give a statement as a "friend witness."

The District Court imposed a prison sentence of 48 months – which constituted a downward variance from the Sentencing Guidelines range – and a total of 60 months of supervised release thereafter, with restitution but no fine.

On September 11, 2013, O'Neal filed a notice of appeal.

## II.

Here, we must determine whether the District Court abused its discretion in preventing questioning about two prior acts by Ramsey that could reflect on his character for truthfulness and excluding testimony about an alleged invitation by Ramsey to participate in "shady" mortgages. *See United States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004) ("We review the district court's evidentiary rulings for abuse of discretion.").

## A.

After Ramsey had testified on direct examination, cross-examination, and redirect, the District Court solicited

questions from the jury. The Court vetted the proffered juror questions with counsel, and then asked Ramsey, "what did you receive in return for testifying against the defendant?" J.A. 459. In response, Ramsey testified that his cooperation agreement required him to "just . . . tell the truth," that he had not "been promised any outcome or result," but that he "hope[d] for the best outcome possible." J.A. 459. In response to a follow-up question about what he meant by the "best outcome," Ramsey testified, "Well, for me, I think being able to continue to live a better and upright life and live my life. I don't have – everybody's desire is to stay free, but no one, including the judge, would make any commitment of anything to me because I made an error. So I would pray that leniency." J.A. 459-60. On recross-examination, Ramsey was asked by defense counsel, "When you say that you want to return to live in this upright life, are you suggesting that you never did anything improper in the mortgage business until you met Ms. O'Neal?" J.A. 460.

At that point, the Government objected and counsel approached the bench. At the bench conference, the Court asked defense counsel whether he had "a good faith basis for believing that [Ramsey had] ever done anything illegal in the real estate industry." J.A. 460-61. Counsel responded that Ramsey had once opened a bank account with a fake document. In his explanation, defense counsel began referring variously to a "drug thing" and the "bank fraud thing." J.A. 461. At this point the prosecution interrupted, clarifying that the only criminal charge against Ramsey was a 2003 misdemeanor charge for uttering a bad check in Maryland. Defense counsel later admitted that the "drug thing" pertained to a different witness, not to Ramsey. The prosecution also protested that there was no conviction on the bad check charge, so questioning on that charge was inappropriate. In response, the Court asked, "[D]oes it have

to be a conviction if it's a bad act and it goes to his credibility?" J.A. 462.

The Court opted to question the witness, outside the presence of the jury, about the allegations. After dismissing the jury, the Court asked Ramsey whether he had been criminally charged in Maryland and if there were "ever any allegations made against you regarding a bad check or opening a bank account with a bad check?" J.A. 464. Ramsey denied that he had ever been "in front of a judge or received any citation." J.A. 464. After hearing this, the Court concluded, "[U]nless counsel has some other information about these allegations in Maryland having been a criminal case, and that there was some culpability found or he admitted culpability based upon what he said, I would have to conclude that this is not an appropriate area to go into." J.A. 467. Defense counsel made no further proffer and no further argument in favor of pursuing this line of recross-examination.

Recross-examination is an area where trial courts have long exercised "wide discretion in controlling the scope and the form of questions employed." *United States v. Landers*, 484 F.2d 93, 95 (5th Cir. 1973); *accord Kitchen v. United States*, 221 F.2d 832, 835 (D.C. Cir. 1955). "A party has a right to re-cross examination only where new matter is brought out on re-direct examination." *Hale v. United States*, 435 F.2d 737, 749-50 (5th Cir. 1970); *see also United States v. Stoehr*, 196 F.2d 276, 280 (3d Cir. 1952) ("Where new evidence is opened up on redirect examination, the opposing party must be given the right of cross-examination on the new matter, but the privilege of recross-examination lies within the trial court's discretion.").

The alleged incidents at issue here were not brought up on redirect or during jury questioning. Defense counsel could have attempted to question Ramsey about these matters during cross-examination, but did not. In circumstances such as these – where counsel seeks to pursue a new line of attack that is not directly responsive to intervening testimony by the witness – recross-examination is a privilege, not a right, and the District Court's discretion is at its apex. We discern no abuse of discretion here.

Amicus submits that the District Court erroneously applied Federal Rule of Evidence 608(b). Rule 608(b) provides:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness.

FED. R. EVID. 608(b).

To be sure, Federal Rule of Evidence 608(b) allows questioning on specific incidents that did not result in a criminal conviction. Nor is an admission of wrongdoing a necessary precondition. Nevertheless, questioning about such incidents must be "probative." *Id.* As with all evidentiary determinations, even if the district court finds that the questioning would be probative, it must then apply the "overriding" balancing test of Rule 403 to ensure that the "probative value not be outweighed by danger of unfair prejudice, confusion of issues, or misleading the jury." FED. R. EVID. 608(b) advisory committee's note to 1972 proposed rule.

To this end, the confusing proffer by defense counsel provided scant support for the probative value of the questioning.  The District Court was left to evaluate a slew of allegations, almost all of which Ramsey had denied, and one of which defense counsel admitted was mistaken.  While a discovery letter regarding these matters was mentioned, neither it nor any other documentation was presented to the Court.  Moreover, there was no indication that cross-examination on these matters would be fruitful, as defense counsel provided no details about the alleged incidents. When given the opportunity to question Ramsey during *voir dire*, defense counsel asked the witness only whether he "had a case in District Court in Maryland" or a "drug case in Maryland," and Ramsey answered both questions in the negative.  Indeed, defense counsel gave the District Court no reason to believe that the answer to either question should have been "yes."  No conviction was noted for the bad check case, and it was possible that Ramsey was never even informed of the charge.[2]  As to the second question, defense counsel later admitted that he was mistaken and the drug case pertained to a different witness.  Given the requirement to weigh the demonstrated probative value of such questioning

---

[2] Further, nothing in the record indicates that the District Court was asked to allow questioning about an allegation identified by amicus involving Ramsey's alleged use of a bad check to open up a bank account in 2006.  Trial counsel briefly adverted to an incident concerning the opening of a bank account with a fraudulent document, but the Government interjected that the incident to which defense counsel referred was the 2003 charge of uttering a bad check.  Defense counsel appeared to agree and never again mentioned Ramsey's opening of a bank account.  When the District Court asked Ramsey about opening an account with a bad check, Ramsey denied any such allegation and defense counsel failed to do any further follow-up.

against the dangers of confusion of issues and misleading the jury, and the fact that direct and cross-examination had been completed, the District Court did not abuse its discretion in declining to allow questioning on these vague allegations during recross-examination.

This background also sheds light on the District Court's comment, after *voir dire*, that questioning about the prior incidents would not be allowed "unless . . . there was some culpability found or [Ramsey] admitted culpability." J.A. 467. This comment is best read as the Court's reasonable conclusion that some boost to the probative value of the questioning – such as a conviction, corroborating details, or an admission – would be required to outweigh the other factors that weighed against its admission. The allegations have little probative value, and Ramsey has limited ability to explain or counter, when the proffer contains no details about dates, name of the bank, name of the account holder, or other pertinent details. The Court's comment need not be read, as amicus argues, as an erroneous conflation of Rule 608(b) and Rule 609. In fact, the Court's earlier question – "[D]oes it have to be a conviction if it's a bad act and it goes to his credibility?" – and request for the "good faith basis" for the inquiry demonstrated the Court's recognition and proper application of the Rule 608(b) test. J.A. 461-62.

Accordingly, the District Court did not misapply Rule 608(b), and its decision to disallow questioning about these incidents was within the ample bounds of the Court's discretion in matters of recross-examination.

**B.**

After Ramsey's testimony concluded, defense counsel sought to introduce testimony from another mortgage broker that Ramsey had "asked her to do some loans, some

mortgages, and that they were shady." J.A. 529. Defense counsel explained that his purpose in introducing Ramsey's statement related to Ramsey's "[c]redibility, and also to rebut some of the things that he said, that he never, you know, did anything shady before this, transactions and that type of thing, or that he's sorry that he allowed himself to be sucked into it, the whole speech that he gave, you know, when he was on the stand." J.A. 529-30. The Government objected on hearsay grounds. After considering both whether the alleged statement was hearsay and whether it was relevant, the District Court ultimately excluded it on the grounds that the statement did not contradict anything Ramsey said during his testimony and was therefore "nothing other than a character assassination." J.A. 533.

Amicus argues that the District Court abused its discretion in excluding this testimony as impeachment-by-contradiction evidence.[3] Regardless of whether the statement was hearsay, the District Court did not abuse its discretion in declining to admit it. In general, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." FED. R. EVID. 608(b). However, "Rule 608(b)'s bar against extrinsic evidence does not apply when the evidence is used to contradict a statement made by a witness during her testimony. Such 'impeachment by contradiction' is subject only to the constraints of Federal

---

[3] We do not address whether this testimony should have been admitted under Federal Rule of Evidence 613(b), which concerns impeachment by prior inconsistent statement, as neither amicus nor O'Neal raised Rule 613(b) on appeal. *See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 532 (D.C. Cir. 2015) ("[S]ince neither Abdelfattah nor court-appointed Amicus pursue these claims on appeal, they are forfeited.").

Rules of Evidence 401, 402, and 403." *United States v. McGill*, 815 F.3d 846, 907 (D.C. Cir. 2016) (per curiam) (citations omitted); *see* FED. R. EVID. 608(b) advisory committee's note to 2003 amendments.

Here, however, defense counsel never asked Ramsey whether he had asked the witness to participate in some "shady" mortgages. Instead, he attempted to introduce the statement through another witness after Ramsey had left the stand. Ramsey did not assert that he had not previously committed mortgage fraud or that all his past mortgage transactions had been aboveboard. Nevertheless, defense counsel proffered the "shady" mortgages testimony to "rebut" Ramsey's testimony that "kind of implied . . . this was out of character for him." J.A. 531. This Court has previously taken a dim view of evidence offered to impeach by contradiction where the evidence did not contradict a "specific statement" made by the witness. *McGill*, 815 F.3d at 908; *see also United States v. Miller*, 738 F.3d 361, 376-77 (D.C. Cir. 2013) (finding no abuse of discretion in prohibiting questioning on cross-examination where "any contradiction would have been ambiguous because [the witness] had not testified on direct examination that he had *never* engaged in" the behavior about which he would have been questioned).

However, we need not decide here the precise level of tailoring required between testimony and contradictory evidence, because the District Court was within its discretion to exclude the testimony under Rules 401, 402, and 403 in any event. *See McGill*, 815 F.3d at 907 ("[I]mpeachment by contradiction is subject . . . to the constraints of Federal Rules of Evidence 401, 402, and 403." (internal quotation marks omitted)). Of course, the general rule in our trial courts is that relevant evidence is admissible and irrelevant evidence is inadmissible. FED. R. EVID. 402. Under Rule 401, evidence

is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401.

The problem here is that O'Neal's trial counsel failed to show what fact from Ramsey's testimony would have been made "more or less probable" by the proffered testimony. Ramsey never said that the fraud with O'Neal was his only "shady" mortgage scheme. Nor did Ramsey claim a one-off motive for participating in this fraud that would have been undermined by his participation in other unsavory deals. Although Ramsey said he saw O'Neal's scheme as a "win-win" in which he could help straw purchasers earn money and aid O'Neal who "had a great dream," he did not deny a pecuniary motive on his part. J.A. 455. He noted that he would get a "referral bonus" and a "good commission" and acknowledged, "of course you're sitting there as a single dad and you're going okay, it's money." J.A. 455, 318. He even admitted that he was "greedy and selfish." J.A. 318. As the District Court put it: "He said he was greedy, and his greed caused him to do this, but I didn't see him as saying that his greed only encompassed the events that are charged in this case." J.A. 531.

To the extent the proffered testimony was relevant at all, it was not an abuse of discretion to conclude that any probative value was substantially outweighed by the other considerations identified in Rule 403, such as undue delay and wasting time. *See* FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

In sum, even assuming the proffered testimony could have overcome the hearsay objection, the District Court did not abuse its discretion in excluding this statement.

## III.

We turn next to the question of whether O'Neal's right to counsel was violated when the District Court allowed her to represent herself at the sentencing stage. "A criminal defendant has a constitutional right to represent himself at trial if he knowingly, intelligently, and voluntarily waives his Sixth Amendment right to counsel." *United States v. Gewin*, 471 F.3d 197, 198-99 (D.C. Cir. 2006) (citing *Faretta v. California*, 422 U.S. 806, 835 (1975)). "That a waiver must be 'intelligent' doesn't mean it must be wise or even reasonable; it is 'undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts.' A defendant's technical legal knowledge is, therefore, 'not relevant to an assessment of his knowing exercise of the right to defend himself.'" *Id.* at 199 (citation omitted) (quoting *Faretta*, 422 U.S. at 834, 836).

However, the trial court does have a responsibility to make the defendant "aware of the dangers and disadvantages of self-representation," *United States v. Brown*, 823 F.2d 591, 599 (D.C. Cir. 1987) (quoting *Faretta*, 422 U.S. at 835), and to engage the defendant in a "'short discussion on the record' regarding these dangers and disadvantages," *id.* (quoting *United States v. Bailey*, 675 F.2d 1292, 1300 (D.C. Cir. 1982)). The purpose of this colloquy is "so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

The same constitutional right of the defendant to represent herself, and concomitant obligation of the court to inform her of the dangers and disadvantages attendant thereto, applies at sentencing. *See United States v. Ellerbe*, 372 F.3d 462, 466-68 (D.C. Cir. 2004).

When O'Neal decided to represent herself at her sentencing hearing, the Court explained to her that – as they had discussed before trial when she first raised the possibility of proceeding *pro se* – she had a right to represent herself, but that doing so meant she may be waiving an ineffective assistance of counsel claim. The Court further admonished O'Neal:

> I always advise people not to represent themselves because lawyers go to school for a long time to learn the law and then practice law, and become more familiar with the law. And therefore, are generally in a better position to provide legal assistance to their clients as compared to their clients providing assistance to themselves especially if they don't have any legal training themselves.

J.A. 720-21. The Court asked O'Neal if she understood, and she said she did. The Court also asked why she no longer wanted trial counsel to represent her. In response to that question, and repeated requests for clarification and greater specificity, O'Neal stated only that "he refused to raise law and legal evidence to protect my right to due process under the law." J.A. 723; *see also* J.A. 721-24. Yielding to her reticence, the Court allowed O'Neal to represent herself, with trial counsel serving as standby counsel.

Amicus argues that O'Neal's waiver of the right to counsel at sentencing was not knowing and intelligent, and

therefore her right to counsel was violated. Amicus asserts that the District Court's colloquy was insufficient, in particular because it did not discuss the United States Sentencing Guidelines, a particularly complicated area of law that plays an important role in the sentencing process.

As a general rule, trial courts are likely best served by relying on a model colloquy – such as that in the Benchbook for U.S. District Court Judges – when confronted with a *pro se* defendant, whether at trial or at sentencing. *See, e.g.*, FED. JUDICIAL CTR., BENCHBOOK FOR U.S. DISTRICT COURT JUDGES 6-7 (6th ed. 2013). "But the Benchbook is merely a training manual and compendium of advice, and it is neither binding nor itself a statement of judicial policy." *United States v. Pasha*, 797 F.3d 1122, 1129 (D.C. Cir. 2015). To evaluate whether O'Neal's right to counsel was violated, we do not compare the trial transcript to the Benchbook's model colloquy, but instead ask whether O'Neal's waiver of that right was knowing and intelligent. This inquiry is primarily informed by the colloquy conducted on the record.

The District Court's colloquy with O'Neal immediately before sentencing explained the ill-advisedness of representing one's self without legal training, asked the defendant if she understood, and gave her the opportunity to ask questions. The Court also advised O'Neal of the possibility that she could be waiving her right to a claim of ineffective assistance of counsel at sentencing.

This pre-sentencing colloquy, already sufficient in its own right, is reinforced by the District Court's lengthy discussions with O'Neal that preceded the trial and the District Court's resulting conclusion that O'Neal knowingly and intelligently waived her right to counsel at trial (although O'Neal later changed her mind and was ultimately

represented by counsel at trial). *See* J.A. 282; *cf. United States v. Bisong*, 645 F.3d 384, 395 (D.C. Cir. 2011) (holding that, despite several months having passed, "the Sixth Amendment does not require a new colloquy to inform the defendant of the risks and difficulties of *pro se* representation where it is discernible in the record that the defendant was made well aware of those risks and difficulties"); *Gewin*, 471 F.3d at 198-200 (determining, after examination of colloquy, that a waiver of the right to counsel encompassed both plea negotiations and trial); *United States v. Weisz*, 718 F.2d 413, 424-28 (D.C. Cir. 1983) (rejecting claim that right of self-representation was infringed at second trial in light of "the record of [the defendant]'s exercise of the right of self-representation at his first trial"). Repeatedly, the District Court advised O'Neal that self-representation was "not a good idea" and questioned her about her understanding of criminal trial procedure. In response to detailed questioning about her familiarity with rules of procedure and evidence, O'Neal repeatedly objected by pointing out that "under *Faretta [v.] California*, I do not have to know what hearsay is" and "under *Faretta [v.] California*, which [has] never been overturned, I have a right to represent myself." J.A. 200.

In light of the District Court's admonishments and questioning, and O'Neal's responses, it is evident that O'Neal was advised of the dangers and disadvantages of self-representation and chose to proceed *pro se* in spite of them. Although the Sentencing Guidelines were not discussed – and although they are central to the sentencing process and *pro se* defendants may be unfamiliar with them – "[n]either case law nor common sense supports the position that a trial court must advise a defendant of each and every difficulty he might encounter in a particular case." *Brown*, 823 F.2d at 599. O'Neal had previously expressed to the District Court that she had a right to represent herself at trial even if she did not

know legal rules such as hearsay, which is true.  Given that, it would seem rather anomalous to hold that her waiver to represent herself at sentencing was not knowing and intelligent because she was not queried about her knowledge of the legal rules of the Sentencing Guidelines.  O'Neal had made it clear that she would not allow ignorance of the law to deter or dissuade her from exercising her right to self-representation.  We therefore reject the claim that O'Neal's right to counsel was violated when she elected to proceed *pro se* at sentencing.

\*\*\*

For the foregoing reasons, we affirm the District Court's judgment with respect to O'Neal's conviction and sentence.

*So ordered.*