# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 1, 2018        Decided May 7, 2019

No. 17-3033

UNITED STATES OF AMERICA,
APPELLEE

v.

TYRONE WRIGHT,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00073-1)

———

*Andrew M. Stewart*, appointed by the court, argued the cause and filed the brief for appellant.

*Anwar L. Graves*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Stephen J. Gripkey*, Assistant U.S. Attorneys.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

2

GRIFFITH, *Circuit Judge*: Displeased with his first two court-appointed attorneys, appellant Tyrone Wright chose to proceed pro se. He made this choice in the face of repeated warnings by the trial judge about the hazards of representing himself in a criminal matter. On appeal, Wright argues that the court erred in denying his request for a third attorney and allowing him to represent himself. We find no error and affirm his jury conviction.

I

Wright was indicted for three counts of bank robbery in violation of 18 U.S.C. § 2113(a). The court appointed David Bos of the Office of the Federal Public Defender for the District of Columbia to represent him. During Bos's first appearance, the court granted a motion by the defense for a 45-day continuance to review discovery and obtain additional information. Bos told the court that Wright, who was not present at the hearing, agreed to the continuance, but when Wright appeared at the next status hearing, he claimed that Bos had not "consulted" him, and that he had not approved this delay. J.A. 22, 25. Declaring to the court that he was "not comfortable with" Bos, Wright asked for either "a new attorney" or permission to proceed pro se. J.A. 22-25.

The court cautioned Wright, "[I]t is a terribly bad idea to go pro se," J.A. 40, and explained that Wright would have more control over trial strategy if he hired paid counsel. When his attempts to hire private counsel failed, the court appointed Peter Cooper as a temporary replacement for Bos to allow Wright time to think about whether he wanted Cooper to represent him going forward. Wright was initially resistant to the idea but eventually agreed that Cooper could represent him and consented to a six-week delay of the impending trial date to allow time to prepare.

As they worked together, Cooper grew concerned that Wright might not be competent to stand trial. With Wright's permission, Cooper asked the court to order a competency screening. The court agreed, and Wright was found competent. Still skeptical, and once again with Wright's consent, Cooper asked the court to order a second, more exhaustive examination. The court did so, and the Bureau of Prisons conducted the examination at the Federal Medical Center in Kentucky. The process took about a month longer than the parties and the court expected but confirmed Wright's competence once again. Based on the two screenings, the district court found Wright competent to stand trial.

This added delay was the final straw for Wright, and over the course of the next month he raised various complaints about Cooper. He questioned Cooper's defense strategy and tactical decisions, and even accused him of working with the prosecution. Wright claimed that Cooper had failed to share critical evidence with him and had agreed to an overly-restrictive protective order that barred him from possessing certain materials while in jail. He accused Cooper of requesting the first competency screening without consulting him, and only asking for the second one because Wright had refused to enter a plea agreement that Cooper had urged him to accept.

Wright told the court that he was uncomfortable with Cooper and did not trust him. He claimed that Cooper had yelled and cursed at him and otherwise failed to adequately communicate with him. According to Wright, Cooper had offended him by asking if he was dissatisfied with his court-appointed lawyers because they were of a different race. Cooper acknowledged that they were having trouble working together but laid the blame at Wright's feet. As Cooper put it, "I will do whatever the [c]ourt asks me to do, but at this time I

see myself as not being in a position to prepare a competent defense for Mr. Wright" because of his "refusal to work with me." Suppl. App. 12-13.

The district court agreed and explained that Wright's complaints about Cooper were either unfounded or the result of his refusal to cooperate with Cooper. Most of Wright's complaints involved disagreements over strategy, and the court made clear to Wright that he was not "entitled to make . . . every single trial strategy decision." J.A. 201. The protective order about which Wright complained was "routine" and permissible, J.A. 197, and the record clearly established that Wright had agreed to both competency screenings. The court credited Cooper's explanation that he had tried to share evidence with Wright, but Wright had cut off those meetings. The court found baseless Wright's suggestion that Cooper was somehow working with the prosecution or had any conflict of interest. As to Cooper's question about racial bias, the court noted that it was not uncommon for defendants to express concern about attorneys who are not of their race. Cooper's question was a reasonable way of exploring whether Wright felt the same.

Eventually, Wright wondered aloud whether asking for another court-appointed attorney would further delay his case. Having already considered and rejected his various complaints, the court explained that Wright would not receive a third appointed counsel. The district court made clear that by denying his request for another lawyer, it was not asking Wright to choose between representing himself and accepting inadequate counsel. *See* Suppl. App. 16 (court agreeing with prosecutor's statements that "there is no Hobson's [C]hoice here" and Cooper is providing "effective assistance"). The court reiterated that any problem with Cooper's representation

was because of Wright, not Cooper. Rather than keep Cooper, his court-appointed lawyer, Wright asked to represent himself.

The court explained to Wright the perils of proceeding pro se, described the charges he was facing and their potential penalties, and asked about his legal training and experience. Wright was invited to explain "[w]hy exactly is it that you want to represent yourself." *Id.* at 20. In reply, he merely recycled prior complaints about Cooper. Wright also expressed concern that Cooper was not capable of representing him adequately at trial. This was because Cooper had presented Wright with a plea offer only one week after he told the court he needed six weeks to prepare for trial. But when the court pushed him on the matter, Wright declined to allege that Cooper was not capable, and said only that he had not seen *affirmative* evidence of Cooper's competence.

The court cautioned Wright yet again about the risks of proceeding pro se and warned him, "you would be much better off with trained lawyers like Mr. Cooper at trial than you are by yourself." *Id.* at 31. "You will have some minimal grasp and familiarity with the law, but not to the extent that the lawyer is going to have, or with the rules of evidence or with court procedure. A trial in federal court is difficult even for an experienced lawyer, and if you represent yourself, you're going to be at an extreme disadvantage given [the prosecutor's] experience and knowledge." *Id.*

Wright was not persuaded, and so the district court explored whether his decision to waive his right to counsel was the result of pressure or threats or made in exchange for any sort of promise. Satisfied it was not, the court asked Wright whether he was taking any "drugs" or "prescribed medications that might impact [his] ability to understand what's going on here." *Id.* at 36; *see id.* at 17-18. Wright responded "[n]o," and

explained that, although he was taking various prescription medications, they "pretty much balance[] me out." *Id.* at 36-37; *see id.* at 17-18. He added, however, that he was not receiving his antipsychotic medicine because of "issues going on in the jail." *Id.* at 36. Although Wright was not sure whether that medicine "could enhance [his] capability as far as balance," he stated that he did not feel that the absence of the antipsychotic limited his ability to understand the proceedings. *Id.* at 36-37. "I feel good about my capacity to represent myself," Wright affirmed. *Id.* at 37.

The court concluded that Wright was competent to waive his right to counsel and could represent himself. "[T]he defendant has articulately and unmistakably asserted his Sixth Amendment right to represent himself," "knowingly, intelligently, and voluntarily waived his right to counsel," and "understands the danger and disadvantages of proceeding on his own and the risk of penalty that he faces." *Id.* at 38. At a subsequent hearing, Wright voiced his agreement with the court's conclusion that, "from a mental health perspective," he was "competent to represent [himself]." *Id.* at 45, 47. As he put it, "I have been getting my medication" and "as long as I got my medication in me, I feel I'm fine." *Id.* at 47.

At trial, the government presented overwhelming evidence of Wright's guilt. The prosecution offered video of the robberies in which Wright's face was visible. It also put on evidence that when arrested, Wright had red stains on his shirt and fingertips like the stains from colored "bait money" used by banks, a demand note nearly identical to the note witnesses had described, and the exact amount of cash stolen from the third bank. *See* Gov't Br. 2-5. The jury found him guilty on all counts, and the court sentenced him to 64 months' imprisonment and 36 months' supervised release and ordered him to pay restitution.

On appeal, Wright argues that the district court "erred in denying [his] request for new counsel and instead allowing him to proceed pro se." Wright Br. 1. We review the denial of a request for new counsel for abuse of discretion. *United States v. Graham*, 91 F.3d 213, 221 (D.C. Cir. 1996). We review de novo whether a defendant "knowingly, intelligently, and voluntarily waive[d] his Sixth Amendment right to counsel." *United States v. Gewin*, 471 F.3d 197, 198-99 (D.C. Cir. 2006). We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

An indigent criminal defendant has the right to effective representation from court-appointed counsel, but he does not have a "constitutional right to choose his [appointed] attorney." *United States v. Bostick*, 791 F.3d 127, 156 (D.C. Cir. 2015). If he is unhappy with his appointed counsel and requests a replacement, "the district court generally has an obligation to engage the defendant in a colloquy" on the record "concerning the cause of [his] dissatisfaction." *Graham*, 91 F.3d at 221. This exchange allows the court to assess whether the defendant has shown the "good cause" necessary to obtain substitute counsel, or to "ease the defendant's concern" about his existing counsel "if it is ill-founded." *Id.*; *see Bostick*, 791 F.3d at 156-57.

A defendant may also elect to represent himself, though that right "is not absolute." *Indiana v. Edwards*, 554 U.S. 164, 171 (2008). He must demonstrate the competence required to waive the right to counsel, which is the same as that necessary to stand trial. *Godinez v. Moran*, 509 U.S. 389, 399-400 (1993). In some circumstances, he must also satisfy the higher degree of competence required "to conduct his own defense at trial." *United States v. McKinney*, 737 F.3d 773, 775-77 (D.C. Cir.

2013) (explaining that to conclude a defendant may not represent himself at trial requires a "threshold" determination that he suffers from a "severe mental illness") (citations and quotation marks omitted).

Moreover, his waiver of the right to counsel must be knowing, intelligent, and voluntary, which the district court determines by conducting a "'short discussion on the record' about the dangers and disadvantages of self-representation," known as a *Faretta* colloquy pursuant to the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1975). *Gewin*, 471 F.3d at 198-99 (quoting *United States v. Brown*, 823 F.2d 591, 599 (D.C. Cir. 1987)). If the decision to proceed pro se "appears grounded in dissatisfaction with [appointed] counsel," the court must allow the defendant to explain the reasons for his dissatisfaction, "evaluate [those] objections," *United States v. Cunningham*, 145 F.3d 1385, 1392 (D.C. Cir. 1998), and "address[] the core elements of the defendant's concern," *United States v. Hall*, 610 F.3d 727, 740 (D.C. Cir. 2010). Of course, if a defendant dissatisfied with his counsel has already asked for and been denied a substitute, it may not be necessary to repeat that discussion in the *Faretta* colloquy. The key is that the defendant must have an adequate opportunity to explain his concerns, and the district court must evaluate them thoroughly.

Asking a defendant to make a "'Hobson's Choice' between accepting appointed counsel whom he fe[els] [is] not prepared for trial and representing himself" calls into question whether his waiver of the right to counsel is voluntary. *See Cunningham*, 145 F.3d at 1392. That is not so, however, when the defendant's qualms about appointed counsel lack merit, are purely subjective, or are of his own making. Such complaints do not constitute the "good cause" necessary to warrant substitute counsel, nor do they render his waiver of the right to

counsel "involuntary." Otherwise, the district court would be required to appoint an unending parade of replacement counsel, no matter how uncooperative the defendant, or risk violating the Sixth Amendment. *See id.* ("Where a defendant's complaints of his counsel's inadequacy plainly lack merit, a court cannot allow itself to be manipulated into . . . appointing new counsel just to placate a defendant threatening to represent himself."); *see also United States v. Irorere*, 228 F.3d 816, 828 (7th Cir. 2000); *United States v. Allen*, 789 F.2d 90, 93 (1st Cir. 1986); *United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983); *McKee v. Harris*, 649 F.2d 927, 932 (2d Cir. 1981).

III

Wright's argument on appeal is narrow. He contends that the district court refused to entertain the possibility of appointing substitute counsel. He faults the court for not inquiring further into his breakdown in communication with Cooper, which Cooper admitted was hindering his ability to prepare Wright's defense. Wright Br. 11. These failures, Wright claims, forced him into a "Hobson's Choice" between accepting counsel he felt was inadequate and representing himself. *See id.* at 12.

We cannot agree. The court provided ample opportunity for Wright to set forth his concerns about Cooper on multiple occasions, assessed whether they warranted substitute counsel, and found them wanting. The court repeatedly rejected Wright's complaints about Cooper's chosen strategy. As for their breakdown in communication, the court acknowledged Cooper's statement but agreed with him that Wright's refusal to cooperate had caused these problems. Given this finding, the court did not need to separately address each allegedly "turbulent communication." *Id.* at 11 (quotation marks omitted); *see Hall*, 610 F.3d at 740-41 (finding *Faretta*

colloquy acceptable because "[t]he answers to" specific concerns about defense counsel's preparedness "were implicit in [his] representations to the district court"). The court even gave Wright time to raise any additional concerns about Cooper during the *Faretta* colloquy. Although the district court did not repeat its discussion of Wright's complaints, there was no need to do so. This colloquy took place immediately after the court had denied Wright's request for substitute counsel, and Wright raised no new concerns about Cooper.

Wright does not direct us to any case in which we accepted a similar "Hobson's Choice" argument. He argues instead that his case is *unlike* three others in which we *rejected* such claims. *See* Wright Br. 11-12 (citing *Cunningham*, 145 F.3d 1385, *Hall*, 610 F.3d 727, and *United States v. Bisong*, 645 F.3d 384 (D.C. Cir. 2011)). But that is simply not so. In each of the cases he cites, the district court fairly concluded that the defendant's concerns about his attorney were unfounded and explained that there was no reason to doubt his attorney's abilities. *See Bisong*, 645 F.3d at 387-94 (rejecting a "Hobson's [C]hoice" argument by a defendant who had requested to proceed pro se multiple times despite the court's assurance that counsel was "extraordinary"); *Cunningham*, 145 F.3d at 1389-92 (same, because the defendant's complaints about counsel "plainly lack[ed] merit" and the court had assured him that his attorney was competent and prepared); *see also Hall*, 610 F.3d at 737-41 (same). As the record makes clear, the same is true here. The minor differences Wright finds between his case and our past decisions—for instance, that Wright wished to expedite his trial while Hall wanted to delay his, Wright Br. 11-12; *Hall*, 610 F.3d at 738—do not overcome these similarities.

A defendant's loss of trust, lack of communication, or serious disagreement about strategy might, in some cases, warrant appointing substitute counsel or render the decision to

proceed pro se "involuntary." This is not such a case. We agree with the district court that Wright's criticisms of Cooper's strategic decisions lack merit and arose from his misunderstandings, which the district court sought to correct. Given this, it was not an abuse of discretion to decline to appoint substitute counsel, nor was it an error of law to conclude that Wright could voluntarily choose to proceed pro se.

Nor was the district court's *Faretta* colloquy otherwise defective. The content of this colloquy "lies within the district court's discretion so long as the court addresses the core elements of the defendant's concern," *Hall*, 610 F.3d at 740, and the colloquy here looks substantially similar to one that "[w]e have characterized as 'model,'" *Gewin*, 471 F.3d at 199 (quoting *Brown*, 823 F.2d at 599). The district court confirmed that Wright knew he was entitled to counsel regardless of his financial status and that he understood the nature of the charges against him and the maximum penalties he faced. *See id.* (caution the defendant about the seriousness of the charges). The court warned Wright that although he might "have some minimal grasp and familiarity with the law" or "the rules of evidence or with court procedure," representing himself would prove challenging, and would place Wright at a disadvantage. Suppl. App. 31; *see Gewin*, 471 F.3d at 199 (warn that the judge cannot assist the defendant and that the trial will use the Federal Rules of Evidence and Criminal Procedure). The court cautioned Wright yet again about the risk inherent in representing himself in a federal criminal trial. *See Gewin*, 471 F.3d at 199 (explain that "proceeding without the assistance of a trained lawyer" is a "'distinct handicap'" (quoting *Brown*, 823 F.2d at 599)). And the court made sure that no one had pressured, threatened, or otherwise coerced Wright into waiving his right to counsel.

We briefly address what Wright does not argue on appeal. Wright does not contend that he was forced to proceed pro se because he did not trust his court-appointed lawyers, although some statements in the record suggest that may have been the case. For instance, Wright told the court that he did not want to proceed with Bos, his first appointed counsel, because lawyers "assigned by the courts . . . investigat[e] for the defendant at their discretion," and he wanted an attorney that would "go after every lead that I want him to look into," and investigate all "the nooks and crannies that I feel should be covered." J.A. 49. He also questioned "whose side [Cooper's] on as far as doing [his] job. Is [he] working with the prosecution, or [is he] working solely for me?" Suppl. App. 21. These statements suggest that Wright may have mistakenly believed that only a paid lawyer would defend him zealously and with undivided loyalty.

Even though Wright does not make any such claim on appeal, we raise it in service of a broader point: Many indigent criminal defendants are suspicious of the government-funded counsel to which they are constitutionally entitled. That could infect a defendant's decision to waive his right to appointed counsel. Appointed counsel faced with this problem do what they can to provide assurance, but the very nature of the concern demonstrates why it is important for the defendant to also hear from the judge. Clients may reasonably be reluctant to voice mistrust to counsel's face and, in any event, hesitate to accept assurances from counsel they view as conflicted. Whenever an indigent defendant seems concerned that counsel is acting disloyally, the district court should take care to prevent such a misperception from playing a core role in the decision to proceed pro se. Indeed, given the importance of the issue and the ease of addressing it, the best practice in any *Faretta* colloquy is for the district judge to explain to the defendant that all attorneys, paid or not, are ethically obligated

to loyally and zealously represent their clients. *See, e.g.*, D.C. R. Prof'l Conduct 1.3; *Hendry v. Pelland*, 73 F.3d 397, 401 (D.C. Cir. 1996).

One other issue gives us pause: During the *Faretta* colloquy, Wright mentioned that he was not receiving his antipsychotic medicine. That issue could have benefitted from further attention on appeal. Medical experts and the district court had found Wright competent to stand trial, and thus to waive his right to counsel. *See Godinez*, 509 U.S. at 399-400 (explaining standards are the same). But Wright stated that he was not receiving his antipsychotic medication at the time he formally elected to proceed pro se, and we cannot determine from the present record whether Wright was receiving his medicine at the time of his competency evaluations. Moreover, while the district court also found Wright competent to represent himself at trial, that requires a higher degree of competence. *Edwards*, 554 U.S. at 178; *McKinney*, 737 F.3d at 776-77; *see* Suppl. App. 47 (district court finding that McKinney's "mental health issues were far more severe" than Wright's). Wright's appellate counsel did not make a point of this in his brief or at oral argument, even after the panel asked the government about this very issue. Oral Arg. 12:19-14:51, 16:54-17:37. Wright has therefore forfeited any arguments related to his competency to waive his right to counsel or to represent himself at trial. *See, e.g.*, *U.S. ex rel. Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015) (issues first raised at oral argument are generally forfeited); *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996) (issues not raised in opening brief are generally forfeited).

## IV

Accordingly, the judgment of the district court is affirmed.
*So ordered.*